### Richmond

METRO REALTY OF TIDEWATER, INC., etc.

v.

FENNER V. WOOLARD, JR.

January 22, 1982.

Record No. 791240.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ.

*Robert G. Jones (Clements, Jones & Frenck,* on briefs), for appellant.

*Michael A. Inman (Inman, Lee & Olivieri, P.C.,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is the appeal of a judgment in a non-jury case rejecting a real estate agent's claim for a commission. The pertinent facts are not in conflict, and we hold the trial court's ruling was contrary to law applicable to this undisputed evidence.

Appellee Fenner V. Woolard, Jr., the defendant below, owned a parcel of land in the City of Virginia Beach. He had planned to construct a building on the property from which to conduct his business of furnishing and installing vinyl and carpet floor covering. During October of 1978, Woolard was "approached" by Mrs. Sherry Harrison, a real estate agent employed by plaintiff-appellant Metro Realty of Tidewater, Inc., trading as Century 21-Metro Realty, who asked whether he desired to sell the property. As the result of the inquiry, Woolard allowed her to seek a buyer on his behalf. Harrison, for her employer, prepared an "Open Listing Agreement" dated October 14, 1978, to expire seven days

later, and delivered it to Woolard. The agreement provided in pertinent part:

"In the event that a Sales Contract is consummated on [the subject property] in the amount of $210,000 or at an agreed sales price, [the Seller] will pay a $10,000 flat fee . . . to Century 21-Metro Realty."

There was no additional provision relating to terms of payment of the purchase price.

On October 16, 1978, Harrison tendered to Woolard an "Official Sales Contract" executed on that day by three individual purchasers. The typed writing provided for a sale of the property for $210,000 to be paid as follows:

"$2,100.00 with contract to apply to purchase price
"$18,900.00 additional cash at closing to apply to purchase price
"$189,000.00 first deed of trust to be held by seller for a period of ten years at an interest rate of 9% per annum, together with the right of anticipation. Annual interest to be computed on the unpaid principal balance."

The document also provided, *inter alia,* for closing of the transaction on or before November 15, 1978, and for payment by the seller to the real estate agent of a "$10,000.00 FLAT FEE" as commission for services rendered. As we shall see, this litigation developed over the subject of interest on installment payments.

On Monday, October 16, Woolard executed the listing agreement but retained and did not sign the proposed sales contract. The terms of payment were not entirely acceptable to Woolard, so he contacted his accountant for advice concerning tax consequences of the sale. Woolard testified the accountant advised him "to take five-year payments, five different years with interest."

During the remainder of that week, Harrison talked with Woolard "every single day." During the conversations, Woolard relayed the accountant's recommendation that he "should only take five equal payments of $38,000 for five years" and that he should not permit the buyers to have an unrestricted right of anticipation. Woolard conveyed his accountant's recommendation that Woolard have the benefit of " 'a 5% pay-off penalty' " so that, for tax rea-

sons, Woolard would " 'have this extra cash if they pay it off, in order to use as a buffer.' "

During "the middle of that week," Harrison visited Woolard's office to discuss the transaction. Because he was not present, Harrison left Woolard a pencilled note (later received in evidence as an exhibit) written on his business stationery, setting forth in detail her understanding of Woolard's preference for terms of payment to be incorporated into the proposed contract. Subsequently, Harrison returned to Woolard's office and they reviewed the note "word for word together." Woolard was "very insistent," according to Harrison, "that he get no more, no less than . . . $38,000 a year, to the point where he insisted that [she] write it." Thus, Harrison wrote with a pen "no more no less" into the memorandum. According to Harrison's testimony, the subject of interest was never mentioned during that conversation; Woolard testified that at some unspecified time during that week he "tried to get across to Mrs. Harrison [that the proposed contract] was acceptable to the interest she got me." Harrison testified Woolard "was dealing with his accountant who was telling him specifically what to tell me, which is what I was trying to help him put in writing."

Following the conversation in Woolard's office, Harrison took the memorandum and reviewed with the buyers' attorney the draft language to be added to the proposed contract. Then, with the attorney's assistance, Harrison "drew up" an addendum to the contract, using language that was almost verbatim the handwritten note.

She returned to Woolard's office on Friday, October 20, and explained the addendum to him. Harrison, in Woolard's presence, lined out with a pen all the foregoing original terms of payment contained in the proposed contract. Next, Harrison wrote adjacent to the stricken language, "ADDENDUM ATTACHED INCORPORATED AND REFERENCE HEREIN:" Woolard initialled the changes and signed the contract.

Woolard then signed the addendum, a separate document. The pertinent portion of that writing provided:
"Purchase price to be paid as follows:

"$2,100-with contract to apply to purchase price
"17,900-cash at settlement to apply to purchase price
"190,000-to be secured by a first deed of trust to be held by seller and to be paid as follows: five (5) equal annual pay-

ments of $38,000 no more, no less, the first payment due and payable on March 1, 1979 with each successive annual payment of $38,000 due and payable each March 1 until and including 1983. Prepayment of total loan balance allowable only after Jan. 1, 1980. In the event of resale, land lease, or development of this property subject to a prepayment penalty of 5% of the unpaid balance."

Harrison immediately took the papers to the buyers. They initialled the contract changes, signed the addendum, and drew a check for $2100, transmitting it to their attorney in escrow. The agent then delivered a copy of the fully executed documents to Woolard.

Harrison departed and Woolard "start[ed] going over" the documents. He testified he "detected something that I felt like it was a mistake on her part." He said he noticed that the nine percent interest provision had been stricken from the contract. Woolard was unable to reach Harrison again on that day but was successful in contacting her the following day, Saturday, October 21.

Upon Woolard's request, Harrison, insisting that "a legally binding contract" existed, later arranged for the buyers to agree to and execute a modification to the contract, intended to replace the addendum. The modification provided, in part:

"Purchase price to be paid as follows:

"$2,100.00-with contract to apply to purchase price
"$17,900.00-cash at settlement to apply to purchase price
"$190,000.00-first deed of trust to be held by seller for a period of five years at an interest rate of 9% per annum. Said interest to begin accruing on unpaid principal balance March 1, 1979, annual principal payment in the amount of $38,000 plus any accrued interest is payable beginning March 1, 1979 and each successive year until debt is retired. Buyer reserves the right of anticipation."

Harrison delivered the modification to Woolard who said, " 'Well, it looks good, but I want to get hold of my attorney and my counsel.' " Woolard did not sign the modification and consulted a lawyer.

Subsequently, Woolard's attorney, responding in February of 1979 to the buyers' demand to close the transaction, proposed certain additional changes to the modification. In turn, the buyers,

insisting the sales contract and addendum constituted the binding contract, threatened to sue the seller.

On February 13, Harrison's employer filed the present contract action against Woolard in the amount of $10,000 seeking recovery of the commission due under the listing agreement. On March 12, Woolard's attorney submitted drafts of closing papers to the buyers' counsel that included provisions for payment of nine percent interest on the annual installments under a proposed deed of trust note. Responding, the buyers refused to close without assurance that the payments under the note would be "interest free as per the contract dated 16 October 1978." Then, Woolard filed a counterclaim in the present action seeking recovery of $52,000 against Metro Realty, alleging Harrison negligently failed to include provisions for interest payments in "a certain document" relating to the subject property.

Finally, the buyers, not wishing "to incur the expense of complex litigation," offered to "release" Woolard from the contract. Receiving no response to that suggestion, the buyers' attorney, in April of 1979, returned "the $2100 earnest money deposit," and the sale was never completed.

At the conclusion of the trial, the court ruled from the bench in favor of Woolard on the plaintiff's claim, and in favor of Metro Realty on the counterclaim. Addressing the claim for the commission, the trial judge said:

> "I just don't think it is reasonable for me to believe that Mr. Woolard would voluntarily enter into an agreement of this kind involving this amount of money for valuable land without providing for interest. It just does not seem reasonable.
>
> "It appears to me that it was Mrs. Harrison's fault that the interest was deleted in the addendum, while Mr. Woolard—maybe he should have picked it up before he signed it. He was more interested in the two other aspects, and I've gone into those before: namely, the five years instead of the ten years, and the deletion of the right of anticipation. And that these were the things he was interested in.
>
> "And that I don't think that it would be fair for Mrs. Harrison or her company that she represents to collect a fee from this man, even though he probably should have picked it up. But in my opinion it was her error in deleting it and not his."

We disagree.

The basic question, of course, is whether, in the language of the listing agreement, "a Sales Contract [was] consummated" on the property in question. Apparently, the trial judge ruled that consummation may have, in fact, occurred on October 20 when the contract and addendum were initialled and signed by all the parties. As best we can interpret his comments, the trial court ostensibly determined, however, that the agent was not entitled to a commission because Harrison failed affirmatively to disclose to Woolard that the provision for interest on the deferred payments had been deleted from the contract and not included in the addendum.

On appeal, Woolard seems to place the foregoing interpretation on the trial court's ruling because, in urging an affirmance, Woolard argues Harrison breached her "duty of loyal service" to him and failed "to perform properly in connection with the sale," thus sacrificing the right to a commission.

▋ The rule is plain that a broker, who is the agent of the owner in negotiating the sale of the owner's property, owes to the principal "the duty to exercise the utmost good faith towards him." *Duncan* v. *Barbour,* 188 Va. 53, 61, 49 S.E.2d 260, 264 (1948). In discharging such duty, the agent must disclose to the principal all facts within the agent's knowledge which are or may be material to the transaction, or which may influence the principal's action; should the agent fail to discharge that duty, the right to recover a commission is forfeited. *Owen* v. *Shelton,* 221 Va. 1051, 1054, 277 S.E.2d 189, 191 (1981). We think the agent here fully complied with such duty, the cases relied on by the owner being factually inapposite.

▋ The undisputed evidence shows that during the week of October 16, Harrison painstakingly ascertained Woolard's preference about the terms of payment of the purchase price. Woolard, a layman, was in constant touch with his accountant, a professional advisor, and was relaying details to Harrison. Finally, toward the end of the week, Harrison reviewed in depth with Woolard the handwritten memorandum, the terms of which were subsequently incorporated, almost word-for-word, in the addendum; neither document provided for payment of interest and Harrison understood Woolard, for tax reasons, did not desire such a provision, that he wanted the annual payment to be "no more, no less," than $38,000.

Moreover, the evidence shows, without a hint of any fraud, duress, or deception by Harrison, that Woolard voluntarily signed the contract, which had been in his possession four days, initialled the changes on the contract, and signed the addendum after it had been explained to him. Even if, in fact, Woolard intended at that time for the contract to provide for interest payments, he was nonetheless bound by his signature under these circumstances and could not have avoided the contract because of his unilateral mistake. In the absence of fraud, duress, or mutual mistake, a person "having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature." *Rossi* v. *Douglas*, 203 Md. 190, 199, 100 A.2d 3, 7 (1953); 13 S. Williston, *Law of Contracts* § 1577, at 501-03 (3d ed. 1970). The record shows Woolard, a mature businessman, had the capacity to understand the terms of both the contract and the addendum.

Confronted by this clear evidence, the trial court was wrong in finding that it was not "reasonable" to believe Woolard would voluntarily enter into the contract "without providing for interest," and in finding that deletion of the interest provision was Harrison's "fault." To the contrary, we hold that Harrison completely discharged her fiduciary duty of disclosure, that the sales contract was "consummated," on October 20, and that Metro Realty is entitled to the commission.

Because of the view we take of the case, it is unnecessary to discuss cross-error assigned by defendant to the trial court's denial of the counterclaim.

Consequently, the judgment below will be affirmed, in part, reversed, in part, and final judgment will be entered here in favor of the plaintiff against the defendant for $10,000.

*Affirmed, in part;*
*reversed, in part;*
*and final judgment.*