Present: All the Justices

ROBERT RAYMOND HARRAH,
ADMINISTRATOR, ETC.
                              OPINION BY JUSTICE A. CHRISTIAN COMPTON
v. Record No. 952312              November 1, 1996

JAMES E. WASHINGTON, JR., ET AL.

                    FROM THE CIRCUIT COURT OF LOUISA COUNTY
                         F. W. Harkrader, Jr., Judge


     In this action seeking recovery for a wrongful death

occurring during a series of motor vehicle accidents on a fog-

shrouded mountain, we consider issues of primary negligence,

unavoidable accident, sudden emergency, and applicability of the

statute dealing with stopping vehicles on highways.

     Appellant Robert Raymond Harrah, Administrator of the Estate

of Peggy E. Harrah, Deceased, filed this action against appellees

James E. Washington, Jr., and Rite Cable Construction, Inc.,

seeking damages for the wrongful death of the plaintiff's

decedent. The plaintiff alleged that on April 20, 1992 the

decedent, his wife, was operating an automobile proceeding in an

easterly direction ascending the western slope of Afton Mountain

on Interstate 64 in Augusta County. The plaintiff further

alleged that defendant Washington, an employee acting within the

scope of his employment with the corporate defendant, was

operating a truck that was stopped in the eastbound lane of I-64.

     The plaintiff further alleged that Washington's negligence

at the time and place caused the decedent's death. In responsive

pleadings, the defendants denied Washington was guilty of

negligence and denied they owed the plaintiff any sum.

     In an August 1994 trial, a jury found in favor of the

defendants.  Overruling the plaintiff's post-verdict motions, the trial court entered judgment on the verdict.  We awarded the plaintiff this appeal from the September 1995 final order.

Following established appellate procedure, we shall summarize the evidence, some of which was conflicting, in the light most favorable to the defendants, the prevailing parties below.

Interstate 64 crosses Afton Mountain in a generally east-west direction.  There are two eastbound travel lanes, separated by a broken white line, with a "breakdown shoulder" adjacent to the right lane.  The accident in question occurred in an eastbound lane on a long, gradual, sweeping curve to the left near the top of the mountain.  A wide median, with grass and bushes, separates the eastbound and the westbound lanes.

Although the weather conditions were constantly changing on the slopes of Afton Mountain during the morning of the day in question, the evidence showed that visibility near the scene at the time of the 11:15 a.m. incident was greatly reduced by fog. An investigating police officer testified the "weather was very foggy," saying he had not encountered worse fog in the area during the 17 years he had been assigned there.

Prior to the incident in question, a series of fog-related accidents had occurred in the westbound lanes of I-64 on the western slope of the mountain.  A Waynesboro volunteer rescue squad crew had been dispatched to render first aid there.  A

crew-member testified that as he was riding in the rescue vehicle, proceeding eastbound up the mountain on I-64 in an effort to find the westbound "wreck," "the only way we could see the wreck is if you looked out the driver's side.  You couldn't see it coming head on."

Eventually, the crew "found the front of the wreck."  The rescue vehicle's driver stopped "the crash truck" partly on the narrow left shoulder of the eastbound lanes. Part of the vehicle rested in the travel portion of the left eastbound lane that was 11 feet 3 inches wide.

The "crash truck" was a heavy vehicle 30 feet long, 8 feet wide, and approximately "11 foot tall."  It was "predominantly white with green stripes."  Testimony showed that the lighting on the rear of the vehicle included six red emergency lights, three on each side, with "four of them going on and off and two of them being . . . like a strobe."  A photograph received in evidence of the rear of the vehicle appears to show ten red lights (five on each side) as well as two large strobe lights near the top (one on each side) and two smaller white lights near the bottom (one on each side).

Approximately ten minutes before the accident sued upon, State Trooper Frank Pyanoe, rushing from Staunton to the scene of the westbound accidents, travelled eastbound on I-64 until he "came upon" the stopped crash truck.  He said it "extended out to the travel area" of the left eastbound lane.  He noticed "a major

accident over on the westbound side." The officer stopped his police vehicle behind the rescue squad truck because "there were no emergency lights flashing at the time" on the truck.

During a conversation between the trooper and a rescue squad member over "some type of electronic . . . difficulty with the vehicle," the trooper advised the member that "he either had to turn the lights on or move to a safer spot, preferably over to the right side of the interstate." Immediately, the lights were activated.

The trooper, driving a 1988 Ford Crown Victoria police cruiser, then proceeded "entirely in the eastbound lanes on the left-hand side" around the crash truck to go to the westbound accident scene. At this time, "the accident had not begun in the eastbound lane."

Defendant Washington, age 38 and a Louisa County resident, left the corporate defendant's Charlottesville office near 8:00 a.m. on the day in question to travel to Staunton to pick up two rolls of cable. The defendant drove his employer's white Dodge Ram truck that had been modified with a "work cab" for storing tools. He was towing a red two-wheel trailer that was ten feet long and about seven feet wide.

Washington testified that, as he crossed Afton Mountain travelling westbound on I-64 en route to Staunton, it was raining and there was "very dense fog on the mountain itself. It was bad."

After loading the cable on the trailer in Staunton, Washington proceeded to return to Charlottesville, travelling eastbound on I-64. Washington testified that when he reached the foot of the mountain on the west near 11:00 a.m., the weather was not "bad" although, he said, "I knew it was bad on the mountain because I just came across it."

Proceeding up the mountain, defendant had the vehicle's lights "on." As he "went up, it got foggier," so he turned his "flashers on." Driving in the right eastbound lane at a speed of 30-35 miles per hour, he "got behind a tractor-trailer." He said that because the "weather was real bad and [he] couldn't see very far," he decided to pass the truck in order "to see better" and to know where he was "headed." He testified that he activated his left-turn signal, looked into his left side mirror, and, seeing no vehicle to his left, "proceeded to the left-hand lane."

When Washington reached the left lane, he saw flashing lights about 50 yards ahead in the left lane. Washington said, "it looked as if there were two ambulances up there." He slowed his vehicle and stopped in the left lane because he "couldn't go any further at that time" due to "traffic in the right-hand lane." Then Washington "looked in the mirror" and saw a white automobile "on the left-hand side of the road off onto the median." This was a 1990 Honda Accord operated by the witness Deborah F. Branstetter.

Branstetter had been travelling eastbound in the left lane

of I-64. She described the weather conditions at the time as cool and "very overcast." The pavement was dry and there was "fog on the mountain." She said the density of the fog would change; visibility improved and "then it would become very thick suddenly." As she ascended the mountain, Branstetter gradually reduced her speed from 65 to 35 miles per hour.

The witness observed defendant's vehicle ahead in the right lane. As she was in the process of overtaking it, and when her vehicle was "even" with defendant's trailer, she could see lights burning on the rear of defendant's truck. At that point, Washington "simply changed lanes." She said that "he did not give a signal." A state trooper testified that a vehicle's "turn signals are cancelled out" when four-way emergency "flashers" are activated.

According to Branstetter, there was no contact between the vehicles because she swerved "out of the way of the trailer into the median strip." She stopped her vehicle with all four wheels in the grassy median.

Alighting from his stopped truck, Washington ran back to the Honda and asked the operator "what had happened." She responded, "You ran me off the road." After determining that she was "all right," Washington ran back to his vehicle and moved it forward in the left lane "a very short distance. A few feet at the most." Washington testified that he desired to move to the right lane but could not because of traffic there and that he "couldn't go

further up because of the crash truck that was in front of me."

"Shortly" after he moved his truck forward, Washington looked "into the mirror" and saw a "gray Cadillac coming," which struck his trailer and truck from the rear. This vehicle was operated by the witness David L. Gooden, who was travelling eastbound on I-64 in the left lane.

Gooden said that as he ascended the western slope of the mountain, the weather conditions changed as he left the bottom of the mountain; the fog "got thicker at the top." He testified there "were spots that you couldn't hardly see at all and spots I could see probably 20 yards." As Gooden came out of "a real dense area of fog," he observed defendant's "pickup with a trailer" stopped 20-25 yards ahead in the left lane. Gooden "hit" his brakes but, travelling at a speed of 45 miles per hour, struck defendant's vehicle.

After being struck by the Gooden vehicle, Washington "got out" of his truck to assist a passenger in the Gooden vehicle who was having difficulty extricating herself from the automobile. At this moment, another automobile crashed into the Gooden vehicle. This was a 1989 yellow Cadillac Seville operated by the plaintiff's decedent.

The collision of the decedent's vehicle with the Gooden vehicle caused the Gooden passenger and a rescue squad member to be pinned under the Gooden vehicle. Washington, rescue squad personnel, and bystanders joined in lifting the gray Cadillac,

freeing the trapped persons.  Shortly thereafter a white truck "came through" and collided with the decedent's vehicle.  This truck was a Ford Ranger pickup operated by the witness Paul W. Burch.

As Burch proceeded eastbound on I-64, the weather "was pretty sunny at the bottom and increasingly cloudy going up the mountain."  According to Burch, "it was very foggy" at "the top of the mountain" until "there was no visibility whatsoever." Travelling at a speed of 25 to 35 miles per hour in the left lane, Burch applied brakes when "the visibility was reduced to almost nothing," and struck the decedent's vehicle without seeing it.

Riding in the vehicle operated by the plaintiff's decedent, age 43, were the Harrahs' two children and their paternal grandmother.  The grandmother was seated in the front passenger seat as they drove in the left, eastbound lane ascending the mountain.  She testified the decedent was driving about 30 miles per hour with the headlights burning "because of the fog."  At the time of impact with the Gooden vehicle, the grandmother's attention was directed to the children riding in the back seat. She described the impact as "light because it did not knock any of us out of our seat belts."  Following the impact, the decedent said, "What have we hit"?

After the collision, the decedent and the grandmother became involved in assisting the children from the vehicle, which was on

the roadway, to the grassy median.  Shortly thereafter, as Burch's truck struck the decedent's vehicle, a rescue worker "saw what appeared to be a body fly through the air."  This was the decedent, who was seriously injured and found "draped across" the red trailer.

At the conclusion of all the evidence, the court denied the plaintiff's motion to strike the defendants' evidence on the issue of liability.  Then, the court gave the jury a profusion of 31 instructions.  Among the issues covered in the jury charge were Washington's primary negligence, the decedent's contributory negligence, proximate cause, superseding and intervening cause, concurrent negligence, unavoidable accident, sudden emergency, and duties of drivers of vehicles stopping on highways.

On appeal, the plaintiff first argues the trial court "erred by not ruling, as a matter of law, that defendant Washington was negligent when he failed to keep a proper lookout and failed to give a visible signal before changing lanes and pulling directly into the path of an oncoming vehicle."  Focusing solely on defendant's alleged involvement with Branstetter, the plaintiff contends the evidence establishes that Branstetter was driving her Honda in the left lane when Washington suddenly turned into her lane to pass a tractor-trailer, and forced her vehicle off the highway.  Continuing, plaintiff says that either Branstetter was in plain view and Washington failed to see her, or it was so foggy that Washington could not see if the left lane was clear to

make a lane change. Under either set of circumstances, the plaintiff argues, Washington breached his duty to maintain a reasonable lookout when he changed lanes.

Furthermore, the plaintiff argues, Washington violated Code § 46.2-848, which requires every driver who intends to turn from a direct line to give a plainly visible signal of such intention whenever the operation of any other vehicle may be affected by such movement. Recalling the testimony to the effect "that flashing hazard lights cancel any attempted turn signal," the plaintiff says it is "uncontradicted that no such signal was given by Washington." Plaintiff contends the fact that "Washington may have pressed down on his turn signal lever is no defense to his failure to give a plainly visible signal."

We do not agree with plaintiff's argument. We are of opinion that the question whether Washington's negligence, if any, was a proximate cause of the collision resulting in decedent's death was, at the very least, a question for the jury. We say, "at the very least," because we do not have the question whether, as a matter of law, Washington's negligence, if any, in changing lanes was <u>not</u> a proximate cause of decedent's death. Thus, given the issues on appeal, we shall go no further than to rule on the question presented by the plaintiff relating to Washington's duties owed to the decedent vis-a-vis the Branstetter incident.

The evidence establishes that Washington initially stopped,

not because of any interaction with Branstetter, but due to the crash truck's position ahead. It was for the jury to determine whether Washington reasonably believed the truck was blocking his passage through the left lane.

Other testimony confirmed Washington's belief that the crash truck blocked his way. For example, the investigating state trooper testified "three to four feet" of the truck was "in the travel portion of the left-hand lane of 64." Another witness testified he recalled "a substantial portion of the crash truck being in the left-hand lane." Yet another witness testified the crash truck "was predominantly in the left-hand lane of travel."

Likewise, it was for the jury to say whether Washington reasonably believed that "bumper-to-bumper traffic" proceeding in the right lane prevented him from moving into that lane and around the truck.

Therefore, the trial court did not err in submitting to the jury questions relating to Washington's conduct as it affected Branstetter and the ultimate role that conduct played in the decedent's death.

Second, the plaintiff argues the trial court erred by giving an unavoidable accident instruction. We agree.

In a mere abstract statement of law, the trial court charged the jury: "An unavoidable accident or incident is one which ordinary care and diligence could not have prevented or one which occurred in the absence of negligence by any party to this

action."

The defendants seek to justify the granting of the instruction by arguing, in part, that inclusion of the phrase "by any party to this action" has significance here. They say that despite all the vehicles involved, "the extreme weather conditions and the crash truck blocking the left travel lane, plaintiff chose only to sue Mr. Washington and his employer in this action, and to file a separate action against the rescue squad which is currently pending in Augusta County." The defendants contend that "Washington was entitled to defend on the basis that this accident was unavoidable from his standpoint."

As we understand the defendants' argument, they contend that if there are nonparties who are negligent in connection with a motor vehicle accident, then a party defendant may invoke the unavoidable accident doctrine to establish such defendant's freedom from fault. We disagree. The fact that all potentially liable parties are not joined in this action does not remove the case from the application of our decisions disapproving use of an unavoidable accident instruction.

Few motor vehicle collisions occur without fault. For this reason, we have emphasized that an unavoidable accident instruction is rarely appropriate in motor vehicle accident cases, although we have not abolished the doctrine or limited it to cases involving accidents resulting from unknown causes. Chodorov v. Eley, 239 Va. 528, 531, 391 S.E.2d 68, 70 (1990).

Such an instruction has the tendency to afford a jury "an easy way of avoiding instead of deciding the issue made by the evidence in the case." Mawyer v. Thomas, 199 Va. 897, 901, 103 S.E.2d 217, 220 (1958). Accord Gardner v. Phipps, 250 Va. 256, 261, 462 S.E.2d 91, 94 (1995).

In the present case, the decedent's death resulted from the negligence of one or more of the several vehicle operators who were involved in this bizarre series of events. Thus, the trial court committed reversible error by instructing on unavoidable accident.

Because the case must be remanded, we shall discuss the other issues raised by the plaintiff, for they may arise upon a retrial.

Third, the plaintiff contends the trial court erred by giving an instruction on the sudden emergency doctrine. We agree.

The trial court charged the jurors that if they believed from the evidence that Washington, "without negligence on his part, was confronted with a sudden emergency and acted as a reasonable person would have acted under the circumstances of this case, he was not negligent." Further, the instruction provided: "A sudden emergency is an event or a combination of circumstances that calls for immediate action without giving time for the deliberate exercise of judgment." Although the instruction correctly sets forth the sudden emergency doctrine,

see Carolina Coach Company v. Starchia, 219 Va. 135, 141, 244 S.E.2d 788, 792 (1978), Washington is not entitled to its benefit under the facts of this case.

For the doctrine to apply, the condition confronting the operator must be an "unexpected happening." Gardner, 250 Va. at 260, 462 S.E.2d at 94. In other words, where a set of circumstances has existed and the party has been exposed to them before, the situation is not "unexpected." Id.

In the present case, Washington was thoroughly familiar with the weather conditions on the mountain at the time, based on both his experience earlier in the morning and his observations as he ascended the mountain just before he stopped his vehicle. Given those conditions, Washington knew, or should have known, that a vehicle might be stopped ahead in his lane of travel. Such an occurrence was foreseeable and not unexpected. See Chodorov, 239 Va. at 531, 391 S.E.2d at 70.

Moreover, Washington was not confronted with a sudden emergency after he reentered his truck and moved it forward a few feet. Then, he had time for the deliberate exercise of judgment.

Finally, the plaintiff contends the trial court's instruction relating to the duties of an operator who stops his vehicle on a highway was incomplete and thus erroneous. We agree.

Code § 46.2-888 prohibits a person from stopping a vehicle in such a manner as to impede or render dangerous the use of a

highway, "except in the case of an emergency, an accident, or a mechanical breakdown." The statute further provides that in the event of such emergency, accident, or breakdown, the stopped vehicle "shall be moved from the roadway to the shoulder as soon as possible and removed from the shoulder without unnecessary delay."

The trial court charged the jury: "The driver of a vehicle has a duty not to stop his vehicle so as to interfere with traffic on the highway or so as to make the highway dangerous to others who are using it, unless there was an emergency or an accident."

Arguing the instruction was incomplete, the plaintiff correctly says the trial court should have instructed the jury on "Washington's additional duty to move his vehicle off the roadway as soon as possible, even though it was properly stopped for an emergency." The instruction was misleading because it ignored Washington's statutory duty to take further action after he stopped. See Armstrong v. Rose, 170 Va. 190, 202, 196 S.E. 613, 617 (1938). Parenthetically, we observe that our ruling applying the "emergency" provision of this statute, is not inconsistent with our previously expressed view that the sudden emergency doctrine does not apply to Washington.

Consequently, although the trial court correctly decided the first issue, the judgment below will be reversed and vacated because of the court's misdirection of the jury, and the case

will be remanded for a new trial on all issues.

<u>Reversed and remanded.</u>