# CIRCUIT COURT OF HENRY COUNTY

Glenn Michael Dennis

v.

PHC-Martinsville, Inc.,
t/a Memorial Hospital
of Martinsville and Henry County

March 31, 2016

Case No. CL14-483

By Judge David V. Williams

"Few of us, when confronted with the threat, 'Your money or your life!' would, like Jack Benny, pause and respond, 'I'm thinking, I'm thinking.' Most of us would empty our wallets." *Smith v. Dorchester Real Estate, Inc.,* 732 F.3d 51, 67 (1st Cir. 2013) (quoting *Mercado v. Ahmed,* 974 F.2d 863, 871 (7th Cir. 1992)). Does that act of acquiescence demonstrate acceptance of an offer and create a contract?

This question might seem far-fetched to anyone but a law professor. *See generally* J. Stanley McQuade, LL. B., M.D., Ph. D., *Jurisfiction* (1982). However, this case, a dispute about a hospital bill, requires consideration of the same basic principles of law concerning contract formation and manifestation of acceptance. The threshold question in this case is whether a contract exists. Resolution of that and the other issues raised by the parties turns on the specific facts of this case. As courts have said, many times and in many ways, "each individual case must be decided on its own particular facts." *Vlandis v. Kline,* 412 U.S. 441, 454, 93 S. Ct. 2230, 37 L. Ed. 2d 63(1973).

Memorial Hospital of Martinsville and Henry County ("the hospital" or "Memorial Hospital") seeks to collect from Glenn M. Dennis the amount that the hospital says Dennis is contractually obligated to pay for services during a brief hospitalization in May of 2014. The hospital's claim was asserted in an amended counterclaim, filed in a tort suit that Dennis brought. The tort case and the amended counterclaim have been severed. This opinion letter discusses only the countersuit.

The amended counterclaim is in two counts. The first seeks a judgment under the purported contract. If the court does not find that Dennis's obligation is fixed by contract, the hospital asks in Count II for the court to enter judgment for the fair and reasonable value of its services to Dennis under an implied contract, or quantum meruit, theory. Dennis agrees that the hospital is entitled to be compensated on that basis, and says that the amount that the hospital already has received represents full and fair compensation.

Both parties waived trial by jury. I have heard the evidence and received and considered the post-trial memoranda and written closing arguments of counsel. In the discussion that follows, any statement of fact about evidence in this case constitutes a finding of fact. I treat the hospital as the plaintiff and Dennis as the defendant, the positions that they occupy on the counterclaim.

## Background

Dennis arrived at Carter Bank and Trust, his place of employment, on May 29, 2014. Karen Pratt, Misty Powell, and Kathy Gravely, Dennis's co-workers, stated that Mr. Dennis was not functioning normally on that day. Ms. Pratt testified that Dennis was "not focusing, not concentrating . . . [and] fidgety." She believed Dennis to be distracted from his work, upset, and scared. Ms. Powell similarly stated that Dennis appeared "very upset. His face was kind of flushed. His eyes were kind of watery. He seemed very fidgety. He couldn't seem to concentrate." Ms. Gravely's testimony was consistent with the other witnesses, as she stated Dennis "was very agitated. I could see in his demeanor, his expression, there was some pain in his face. He acknowledged he was having chest pains that were like he had had before [during a previous heart attack]." Ms. Gravely did not trust Dennis to be in the bank that day, and Ms. Pratt drove him to Urgent Care because she did not think Dennis capable of driving himself.

Dennis was seen by medical personnel at an Urgent Care facility, where he was joined by Patricia Dennis, his wife, who testified that Dennis was "crying . . . upset . . . [and] agitated." The staff at Urgent Care quickly determined that Dennis should be transferred to the hospital. Dennis arrived at Memorial Hospital in an ambulance in acute emotional and physical distress. Throughout this ordeal, Dennis was suffering from chest pains similar to those he had experienced while having a heart attack some years earlier. Nitroglycerin did not seem to relieve his pain, and Dennis was agitated, tearful, illogical, less-than-normally coherent, and fearful.

Some 45 minutes after Dennis arrived at the hospital, Virginia Ramsey, a hospital registrar, brought papers for him to sign. He was lying prone in a room in the emergency department, and monitors were attached to his person. He had undergone a preliminary assessment by the medical staff. Dennis believed he was having a severe heart attack and, as he lay

there, began to fear that he was going to die. (In testimony, he employed euphemisms to say so: he said he hoped he would not "go away," and wondered "what would be left behind.") He was eager for treatment to begin.

Ms. Dennis, who was in the room while Ms. Ramsey was there, testified that, while she did not recall Ms. Ramsey's exact words, their essence, as she understood it, was that these were the papers that Dennis had to sign in order to be treated. She also testified that Dennis was unable to concentrate or read when given the consent form to sign. Ms. Ramsey (who does not specifically recall Dennis or this occasion) testified that her habit or practice is simply to tell the patient that, by signing these documents, he gives the hospital permission to treat him, verifies the information that the hospital has about him, and guarantees that his bills will be paid. She does not read the documents to the patient.

Dennis testified that, though he does not specifically recall Ms. Ramsey, he knew that the hospital wanted him to sign something, and he wanted to "move on so I could get treated." Ms. Ramsey was in the room for an estimated two minutes. Dennis signed the documents that she had brought.

### The Financial Responsibility Agreement

The hospital bases its contract claim on the "Financial Responsibility Agreement" that Dennis signed in the emergency department. The fourth numbered paragraph of this document says, in part, that the patient is "obligated to promptly pay the hospital in accordance with the charges listed in the hospital's charge description master and, if applicable, the hospital's charity care and discount policies and state and federal law." The same paragraph contains an acknowledgement that, "except where prohibited by law, the financial responsibility for the services rendered belongs to [Dennis, the patient]." (The charge description master, or CDM, is discussed below.)

The financial responsibility agreement is a form document, prepared by the hospital, and presented by a hospital employee to all patients (or, for those not capable of signing, their representatives), to be signed before treatment is rendered. According to counsel for the hospital, "[t]he terms of the FRA [financial responsibility agreement] signed by Mr. Dennis are the same as those of every other patient agreement in the same time frame — whether elective or emergency, whether inpatient or outpatient." Hospital's Post-trial Memorandum, 3.

### The CDM (Charge Description Master)

As noted, the financial responsibility agreement calls for the patient to pay "in accordance with the charges listed in the hospital's charge description master," or CDM.

The CDM is "a set of electronic data maintained on the Hospital's Meditech networked computer system." Counterclaim Plaintiff's Post-Trial Memorandum 3. See *Oracle Am., Inc. v. Google, Inc.*, 750 F.3d 1339, 1355 (Fed. Cir. 2014) (describing such a system as a collection of "zeros and ones through which the computer directly receives its instructions") (citations omitted). (I assume, for present purposes, that the CDM is a "writing," under Va. Code § 1-257.)

The CDM is supposed to be an electronic list of everything for which the hospital might charge a patient and a list of the current cost of each of those things. When a chargeable event occurs (*e.g.,* a service is rendered, supplies are used, or a medication is dispensed) the appropriate code for that event or service is entered into the patient's digital information on the computer network. The patient account system then queries the CDM; the CDM then tells the account system the current price for the event or service, and that charge is posted to the patient's computerized ledger sheet.

Approximately once a month, the data in the CDM, as it then exists, is exported to a written spreadsheet. A spreadsheet, printed within a few days of Dennis's admission, is in evidence to show the contents of the CDM on the day that it was printed.

At all times material to this case, the hospital treated the contents of the CDM as "double secret," or confidential or proprietary information. After Dennis was billed, he several times (in person and otherwise) asked the hospital for a copy of the CDM. The hospital refused to allow him to have a copy, and it refused to allow him to see a copy. During this litigation, the hospital declined to produce a copy in response to discovery requests until the matter was brought before the court, and the court ordered production.

*Dennis's Bill; Contracts with Health Insurance Carriers*

Dennis was discharged after two nights in the hospital. The hospital calculated his bill under the CDM, charging him $111,115.37. Dennis had health insurance. He and his carrier have paid the hospital $27,254.95.

The hospital has contracts with a number of health insurance carriers under which the hospital has agreed to sharply discount the bills of patients covered by those carriers. Those contracts permit the hospital to collect only the amount established by the contract plus any co-payment that the patient is required to pay. See *State Farm Mut. Auto. Ins. Co. v. Bowers,* 255 Va. 581, 500 S.E. 2d 212 (1998). The hospital is also limited in the amount that can be collected from patients covered by Medicare and Medicaid. Dennis's health insurance carrier did not have a contractual relationship with the hospital; he was not covered by Medicare or Medicaid.

The practice of billing the patient for the difference between the amount charged and the amount that the hospital is reimbursed, which is what the hospital has done in this case, is known as "balance billing." See *Rehab. Ass'n v. Kozlowski,* 42 F.3d 1444, 1447 (4th Cir. 1994); Va. Code §§ 32.1-

137.1, 38.2-5800; David J. Marchitelli, "Use of Balance Billing in Health Care Context," 69 A.L.R.6th 317 (2015).

## Contracts and Contracting

"To recover in an action *ex contractu*, the plaintiff [the hospital] must, of course, prove the existence of a contract, oral or written. *Valjar, Inc. v. Maritime Terminals, Inc.*, 220 Va. 1015, 1018, 265 S.E.2d 734, 736 (1980). It must do so by the greater weight of the evidence. *Id.*; *Green v. Goodman-Gable-Gould Co.*, 268 Va. 102, 108, 597 S.E.2d 77, 81 (2004); *Horace Mann Ins. Co. v. Government Employees Ins. Co.*, 231 Va. 426, 430, 344 S.E.2d 906, 909 (1986).

There is an underlying, implicit assumption in the hospital's arguments that, because Dennis signed the financial responsibility agreement, the burden has shifted. That assumption has no support in Virginia law. The burden remains with the plaintiff throughout the case.

The cases cited by the hospital in support of its implicit assumption that proof that the defendant signed is all that is needed to prove a contract (and the authorities upon which those cases relied) do not support that assumption. The hospital cites *First Va. Bank-Colonial v. Masri*, 245 Va. 461, 463, 428 S.E.2d 903, 904 (1987), and *Metro Realty of Tidewater, Inc. v. Woolard*, 223 Va. 92, 99, 286 S.E.2d 197, 200 (1982). In the former case, *Masri*, there was no issue about whether a contract existed. Masri in fact sought to enforce the contract; he and his wife sought to avoid the burdens of an assumption of risk clause on the back of the contract, which he had not read, while seeking damages for breach of the obligations on the front of the document. *Masri*, 245 Va. at 462-64. The facts of *Woolard* are complicated by the fact that Mr. Woolard had very clear ideas about what he wanted the documents to say in this commercial transaction. Documents were rewritten, and Mr. Woolard kept the final form of contract for four days before signing and delivering it. He later concluded that there was a missing term in the contract, and that he had made a mistake in signing the document, and refused to go through with the transaction. He was sued for the real estate commission. He counterclaimed, and this appeal arose from his counterclaim. *Woolard*, 223 Va. at 98-99. The Supreme Court has warned against reliance on abstract statements of law. See, *Harrah v. Washington*, 252 Va. 285, 293, 477 S.E.2d 281, 286 (1996); *Marine Dev. Corp. v Rodak*, 225 Va. 137, 142, 300 S.E.2d 763, 767 (1983).

## Meeting of the Minds

One of the fundamental rules of Anglo-American law is that "[a] meeting of the minds is essential to the formation of a contract." *Dixon v. Hassell & Polices, P.C.*, 283 Va. 456, 463, 723 S.E.2d 383, 387 (2012) (citations omitted).

> "It is elementary that mutuality of assent — the meeting of the minds of the parties — is an essential element of all contracts." *Lacey v. Cardwell*, 216 Va. 212, 223, 217 S.E.2d 835, 843 (1975) (quoting *Green's Ex'rs v. Smith*, 146 Va. 442, 452, 131 S.E. 846, 848 (1926)). "Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent and, therefore, no contract." *Persinger & Co. v. Larrowe*, 252 Va. 404, 408, 477 S.E.2d 506, 509 (1996) (citing *Progressive Constr. Co. v. Thumm*, 209 Va. 24, 30, 161 S.E.2d 687, 691 (1968)); *see also Valjar [Inc. v. Maritime Terminals, Inc.]*, 220 Va. [1015] at 1018, 265 S.E.2d [734] at 736-37 [(1980)] ("A contract cannot exist if the parties never mutually assented to terms proposed by either."); *Chittum v. Potter*, 216 Va. 463, 467, 219 S.E.2d 859, 863 (1975) ("It is crucial to a determination that a contract exists . . . that the minds of the parties have met on every material phase of the alleged agreement.").

*Phillips v. Mazyck*, 273 Va. 630, 636, 643 S.E.2d 172, 175 (2007).

As the hospital correctly notes, meeting of the minds may be inferred from the parties' words and conduct; unexpressed mental reservations will not vitiate a contract when a party's behavior signals acceptance. The court is to consider all of the objective facts and circumstances in determining whether there was mutual assent. *Id.*; *Dixon*, 283 Va. at 463-64; *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980) ("The issue is always ultimately resolved by a 'determination of the intention of the parties, as objectively manifested'.") (quoting *Goldbard v. Empire State Mutual Life Ins. Co.*, 5 App. Div. 2d 230, 234, 171 N.Y.S.2d 194, 199 (1958)).

A contract is "a legal instrument prescribing consensual rights and obligations of the parties . . . not a one-sided deal. A contract results from the bargain made on a free and voluntary basis between parties of equal footing." Mo Zhang, "Contractual Choice of Law in Contracts of Adhesion," 41 Akron L. Rev. 123, 126 (2007); see *Barber v. Vista RMS, Inc.*, 272 Va. 319, 329, 634 S.E.2d 706, 712 (2006) ("contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice") (quoting *Atlantic Greyhound Lines v. Skinner*, 172 Va. 428, 439, 2 S.E.2d 441, 446 (1939)).

### Contracts of Adhesion

[A] contact whose terms are dictated by one contracting party to another who has no voice in its formulation" is known as a contract of adhesion. Arthur L. Corbin, *Corbin on Contracts*, vol. 1, § 1.4, 13 (Joseph M. Perillo, ed., rev. ed., 1993). It is "a standard-form contract prepared by one party,

to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms." *Black's Law Dictionary* at 342.

> Although one who executes a written contract is generally "presumed to know the contents of the contract and to assent to those specified terms," the law pertaining to contracts of adhesion "recognizes that in certain circumstances, traditional assumptions associated with contract law are unfounded." Contracts do not always reflect terms that were bargained for at arms length; instead, terms are sometimes dictated by one party to another who has no bargaining power and no realistic options. Thus, we have recognized that contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party whose choice is either to accept or to reject the contract without the opportunity to negotiate its terms.

*Woodruff v. Bretz, Inc.*, 2009 MT 329, 353 Mont. 6, 218 P.3d 486, 489-90 (2009) (citations omitted). When one party presents another with an adhesion contract:

> [A]n attempt to read the pre-printed provisions of the documents will likely be met with impatience. Indeed, reading the rest of the provisions of the documents might be rather pointless because the [party in inferior position] has only the choice between taking the offered terms or leaving them. The process of entering into a contract of adhesion "is not one of haggle or cooperative process but rather of a fly and flypaper."

Corbin, vol. I, § 1.4 (quoting Arthur Leff, "Contract as a Thing," 19 Am. L. Rev. 131, 143 (1970)).

When he was presented the financial responsibility agreement, Dennis had an objectively reasonable belief that he was having a life-threatening major attack. Doctors had told him so, and had hurried him out of the urgent-care facility and into an ambulance to the hospital, where proper treatment was available when he signed the proper required forms.

> [A]n act may be "unfree" not only when compelled by an outside force (as in Aristotle's example where the wind carries a man away), or when taken in ignorance (as when the actor is blind drunk), but also when the actor lacks any real choice or alternative ("your money or your life").

*Ismert & Associates, Inc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 549 (1st Cir. 1986).

A reasonable and prudent person in Dennis's position was, as a New Jersey court said in another hospital balance-billing case, "in no position to reject the proffered agreement, to bargain with the hospital or, in lieu of agreement, to find another hospital." *Valley Hosp. v. Kroll*, 368 N.J. Super. 601, 847 A.2d 636, 651 (N.J. Law Div. 2003) (citations omitted). "The terms contained in the form were non-negotiable." *Id.* Treatment apparently was necessary, "and the option of walking away was simply unrealistic." *Id.*; see *Rory v. Continental Ins. Co.*, 473 Mich. 457, 703 N.W.2d 23, 42 (2005) ("If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.").

So far as Dennis knew, his life was on the line. His hope of receiving medical treatment lay in signing the papers he was presented. As Chief Justice Roberts has written, "'[y]our money or your life' is a coercive proposition, whether you have a single dollar in your pocket or $500." *National Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2605, 183 L. Ed. 2d 450, n. 12 (2012).

## Secrecy of the CDM

The hospital's insistence that the CDM was secret and that Dennis was not entitled to have or see it is also a significant objective manifestation, by conduct of a party, that no contract was created by the written financial responsibility agreement. Mutual assent of the contracting parties to terms reasonably certain under the circumstances is objectively impossible when the information that would be necessary to understand those terms is contained in a database to which one of the parties is denied access by the other. See *Allen v. Aetna Casualty & Surety Co.*, 222 Va. 361, 364, 281 S.E.2d 818, 820 (1981). No definition of the word "mutual" encompasses a situation in which all of the information about a critical contractual element is held by one of the parties, who refuses to share it with the other party. Compare *Cox v. Athens Reg'l Med. Ctr., Inc.*, 279 Ga. App. 586, 631 S.E. 2d 792 (2006) (hospitals required by law to make pricing information available, and to do so in a clear and comprehensible way in order to permit consumers to compare hospital charges and make cost-effective decisions about purchase of hospital services).

## Decision on Count I: Claim of Express Contract

As discussed above, the plaintiff had the burden of proving by the greater weight of the evidence that the parties mutually had entered into a binding contract. The hospital has failed to meet that burden.

Dennis also argued that the purported contract failed because it was not certain and complete — that it was missing an adequate price term. Since I have found that there was no contract, I need not address that contention.

### Quantum Meruit

In Count II of its amended counterclaim, the hospital asserts that, even if the court finds, as it has, that no express contact existed, Dennis is still obligated by an implied contract to pay the reasonable value of the services rendered. Dennis agrees. And so does the court. See *Mongold v. Woods*, 278 Va. 196, 203, 677 S.E.2d 288, 292 (2009).

A plaintiff seeking damages on a *quantum meruit* theory, like the plaintiff in any other breach-of-contract case, has the burden of proving its damages with reasonable certainty. See *Sunrise Continuing Care, L.L.C. v. Wright*, 277 Va. 148, 157, 671 S.E.2d 132, 137 (2009); *Marine Development Corp. v. Rodak*, 225 Va. 137, 140-41, 300 S.E.2d 763, 765-66 (1983) (*quantum meruit* recovery appropriate after court finding that no express contract existed). The determination of damages due under an implied contract will, as in any contract case be fact-specific; no single method exists for proving or calculating damages. See *Nichols Constr. Corp. v. Virginia Mach. Tool Co.*, 276 Va. 81, 89, 661 S.E.2d 467, 472 (2008). The court, like a jury, may consider all of the evidence presented, whether introduced by the hospital or by Dennis, and whether elicited on direct or cross-examination, in determining what damages have been proven by the greater weight of the evidence. See *Estate of Taylor v. Flair Property Assocs.*, 248 Va. 410, 415-16, 448 S.E.2d 413 (1994).

Although my decision is, and must be, fact-specific, my judgment is informed by decisions of the Supreme Court of Virginia such as, e.g. *State Farm Mut. Ins. Co. v. Bowers*, 255 Va. 581, 500 S.E.2d 212 (1998); *Smith v. Richmond Mem. Hosp.*, 243 Va. 445, 416 S.E.2d 689 (1992), cert. denied, 506 U.S. 967, 113 S. Ct. 442, 121 L. Ed. 2d 361 (1992).

In determining the reasonable value of the services rendered to Dennis, I have considered and weighed all of the admitted evidence and the arguments of counsel. Dennis received a bill from the hospital for $111,115.37 and has paid $27,254.95; the hospital is suing for the remaining balance of $83,860.42. The hospital acknowledges that it charges all uninsured patients and insurance providers the same amount for medical procedures and supplies used; however, the hospital accepts payment at different rates from these parties based on pre-negotiated terms.

For example, an uninsured patient who had arranged pre-payment of services would receive a 75% discount from the hospital. Thus, had Dennis arranged pre-payment, he would still have been charged $111,115.37, but the hospital would have accepted $27,778.84 to satisfy the bill. If Dennis received Medicare subsidies, Medicare would be charged $111,115.37, but due to pre-determined federal rates, the hospital would only receive

approximately $20,000.00. If Dennis were insured by Anthem, Anthem would also be charged $111,115.37, but due to pre-negotiated contract rates, the hospital would only receive $23,389.00.

I find that the reasonable value for the services Dennis received is $27,778.84, the amount the hospital would have received had Dennis pre-paid his bill as an uninsured patient. The amount Medicare would pay the hospital is a federally-set rate that remains an outlier in determining reasonable value. The amount Anthem would pay represents a company-negotiated rate on behalf of a large volume of clients. Dennis's situation more closely resembles that of an uninsured patient, as Dennis's insurance was not recognized by the hospital. A similarly situated person could have negotiated for services to be performed at a cost of $27,778.84, and the hospital would have agreed to that amount. Dennis owes the Hospital $523.89, the difference between the reasonable value for the services provided and what he has already paid the hospital.