847 A.2d 636 (2003)
368 N.J. Super. 601
The VALLEY HOSPITAL, Plaintiff,
v.
Halina KROLL, Defendant.
Halina Kroll, Edwina Kroll, Edmund Kroll, Jr., Estate of Edmund Kroll, Plaintiffs,
v.
The Valley Hospital, Dr. Steven Cohen, Defendants.
Superior Court of New Jersey, Law Division, Passaic County.
Decided April 17, 2003.
*638 Steven Stadtmauer, for Valley Hospital (Celentano, Stadtmauer & Walentowicz, LLP, attorneys).
Gavin J. Rooney, Roseland, for Halina Kroll (Lowenstein Sandler, PC, attorneys).
Raymond R. Chance, III, Trenton, for Peter C. Harvey, Acting Attorney General of New Jersey for Commissioner Holly C. Bakke.
*637 RIVA, J.S.C.

I. INTRODUCTION
As part of a consolidated action, plaintiff, Valley Hospital, seeks to collect the sum of $257,188.90 from defendant, Halina Kroll, for services rendered to her late husband, Edmund Kroll, Sr., during periods of 1999 and 2000, based on a breach of contract. The purported debt represents the difference between the hospital's so-called "standard" charges and the benefits paid to it by decedent's Medicare Part A and supplement insurance coverage, otherwise known as "Medigap" insurance.
Mrs. Kroll moves for partial summary judgment on the ground that Valley Hospital may not "balance bill" patients for post-Medicare Part A services. Because this decision is one of public importance involving the interpretation of New Jersey's supplement insurance regulatory scheme and its state-wide impact on hospital billing charges, the court felt obliged to hear from the Commissioner of the Department of Banking and Insurance ("Commissioner" and "DOBI") and, with the consent of the parties, a brief was filed on behalf of amicus curiae, Commissioner Holly C. Bakke.[1]
The court has considered the submissions and arguments of counsel. Legitimate inferences have been given to Valley Hospital in accordance with summary judgment principles. See R. 4:46-2 and Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). Applying this standard, Mrs. Kroll's motion is granted.[2]

II. UNDISPUTED FACTS
On March 30, 2000, Edmund Kroll, Sr. died after a long and debilitating illness. Several months later, Valley Hospital sent his grieving eighty-year-old widow, Halina Kroll, a bill for $257,188.90 and thereafter filed suit against her to recover the alleged debt.
*639 Mr. Kroll was initially admitted to Valley Hospital on January 26, 1999, for inpatient removal of a diverticulum of his bladder, where he remained until his discharge on January 30, 1999. Only two days after his discharge, Mr. Kroll suffered a massive stroke, which permanently paralyzed the entire left side of his body. He was immediately re-admitted to Valley Hospital and stayed there until his discharge to an acute nursing care facility on March 21, 1999. Mr. Kroll was once again confined at Valley Hospital for treatment of an infection from April 4, 1999, to sometime in June 1999. Finally, he was re-admitted to the hospital due to kidney problems related to his diabetes from September 27, 1999, until his passing. During his last hospitalization, Mr. Kroll developed gangrene on his extremities, which was listed as the cause of his death.[3]
Mr. Kroll's first and second hospitalizations were fully covered by his Medicare Part A benefits. Of the 121 days of his third admission, Valley Hospital claims that twenty-three days were not covered by Medicare after the exhaustion of his 150 days of Medicare benefits. There was no Medicare hospitalization coverage for Mr. Kroll's last admission.
In February 2000, the hospital's billings and collections representative contacted Mr. Kroll's son, Edmund Kroll, Jr., to inform him that his father's Medicare Part A benefits had been exhausted. At that time, Mr. Kroll, Jr., advised Valley Hospital of the coverage provided under his father's Medigap policy obtained on April 1, 1995 from the American Association of Retired Persons ("AARP"),[4] and furnished the hospital with the pertinent AARP information so that it could pursue payment from the insurer. Valley Hospital's representative then contacted AARP and confirmed the existence of the additional 365 days of hospitalization under the Medigap policy. In fact, Valley Hospital accepted an assignment of the benefits under the policy.
For the April to June 1999 admission, Valley Hospital rendered a bill for $214,398.01 and sent it to Medicare. Medicare paid Valley Hospital $79,317.26, and the hospital wrote off the $111,785.95 difference between the Medicare payment and its charges for the days covered by Medicare as required by federal law.
After Mr. Kroll's death, Valley Hospital sent a bill to AARP in the amount of $502,019.73 covering twenty-three days of the third admission and the final admission. This period was not covered by Medicare. AARP paid Valley Hospital $8,428.42 and $221,114.70 for the third and final admissions respectively. These payments left a balance representing the difference between the Medigap benefits paid by the carrier and the full amount of Valley Hospital's charges of over one-quarter of a million dollars![5]

III. ANALYSIS

1.
At the time of his hospitalizations, Mr. Kroll was covered by Medicare. The parties *640 agree on the general provisions of the Medicare program applicable in this case.
The Medicare Act provides health insurance for the aged and disabled. It is a federally funded subsidized program that reimburses for medical services provided to qualified elderly and disabled persons. See 42 U.S.C.A. § 1395. The Medicare program consists of two parts. Medicare Part Athe relevant program in this casecovers inpatient hospital services.[6] Part A covers expenses for 90 days for each "spell of illness." See 42 U.S.C.A. § 1395d(a)(1). When a "spell of illness" is broken by a period of sixty days during which a patient is not hospitalized, a new period of ninety days commences. Ibid.; see also 42 U.S.C.A. § 1395x(a). Medicare also allows for coverage of sixty additional lifetime reserve days. See 42 C.F.R. § 409.61(a)(2). These reserve days are non-renewable. Ibid. The lifetime reserve days can be used at any time; however, once they are used they are gone forever. Ibid.
The primary responsibility within the United States Department of Health and Human Services for administration of the Medicare program was given to the Health Care Financing Administration ("HCFA"), which is now known as the Center for Medicare and Medicaid Services ("CMS"). Medicare does not pay a hospital's standard charges; rather, it reimburses hospitals using a payment methodology based upon a Diagnostic Related Group ("DRG") classification, which is a numeric code assigned depending upon the type of illness being treated. The HCFA adopted the DRG payment methodology in order to create an incentive for more efficient care for the hospitalization coverage provided by Medicare. It recognized that traditional fee-for-service payment encourages inefficiency because a hospital could increase its revenue by providing unnecessary care. In response, the HCFA adopted the DRG system whereby a hospital is paid one flat fee for the entire hospitalization, depending upon the illness being treated, subject to certain adjustments known as "outliers".[7] In theory, the DRG methodology avoids the incentive of a hospital to over-hospitalize or provide inefficient care because it receives a fixed amount of compensation regardless of a patient's length of hospitalization. Since the DRG payments represent the average cost for each illness, the hospital will in the aggregate receive adequate compensation for all patients treated with the same DRG code. See generally Ellis, R.P., Hospital Payment in the United States: An Overview and Discussion of Current Policy Issues (2001).
Federal law permits the HCFA to enter into a "provider agreement" with a hospital. The basic terms of this agreement are set out at 42 U.S.C.A. § 1395cc. Valley Hospital executed a provider agreement with the HCFA. The hospital agreed "among other things, not to charge ... any individual or any other person for items or services for which such individual is entitled to have payment under this subchapter."[8]See 42 U.S.C.A. *641 § 1395cc(a)(1). In other words, it accepted as full payment the DRG amount, along with any co-payments and deductibles, in exchange for receiving payments from Medicare. Id. The provider agreement, however, has no applicability to charges for post-Medicare Part A benefits. (emphasis added). There is no language contained in Subchapter XVIII, 42 U.S.C.A. § 1395-1399ccc(e), which relates to payment for services after the exhaustion of Medicare benefits.

2.
Anxious about the devastatingly high costs of healthcare, Mr. Kroll, like many senior citizens, purchased Medicare supplement insurance, otherwise known as "Medigap" insurance, to fill in the "gaps" of his Medicare coverage. In general, his policy covered the co-payments and deductibles not covered by Medicare and, particularly pertinent here, provided an additional 365 days of hospitalization after exhaustion of the 150-day period under Medicare.
Medigap insurance is tightly regulated by federal and state law. While the Medicare program was in effect, Congress became concerned that older citizens were being exploited by the sale of Medigap policies that did not provide the coverage buyers thought they were purchasing. See Social Security Disability Amendments of 1980, Pub.L. No. 96-265, § 507(a) (June 9, 1980) (codified at 42 U.S.C.A. § 1395ss(f)(1)(A)). In order to protect the consumer and avoid agent abuse, the federal government passed legislation in 1990 mandating that Medigap insurers conform their policies to one of ten model Medigap plans, to be developed by the National Association of Insurance Commissioners ("NAIC"). See Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101-508, § 4351 (Nov. 5, 1990) (codified as amended at 42 U.S.C.A. § 1395ss(p)). The NAIC developed ten different benefit plans which could be sold and dictated the benefit configurations for each plan. Plan Fthe plan purchased by Mr. Krollis one of these ten standardized plans.
In 1992, the HCFA promulgated regulations adopting the NAIC Model Regulation ("Model Regulation") as revised in 1991. See 42 C.F.R. § 403.200; 57 Fed. Reg. 37,980 (Aug. 21, 1992); see also 63 Fed. Reg. 67,078 (Dec. 4, 1998) (adopting the NAIC Model Regulations, "as corrected and clarified by HCFA" to be the "applicable NAIC Model Regulation" for purposes of Medigap insurance). As amended in 1994, the Medigap statute now provides that no Medigap policy may be issued in a state unless that state has provided "for the application and enforcement" of the 1991 Model Regulation. See Social Security Act Amendments of 1994, Pub.L. No. 103-432, § 171 (Oct. 31, 1994) (codified at 42 U.S.C.A. § 1395ss(a)(2)(A)).
Under federal law, the State's regulatory program for Medigap insurance must provide for standards equal to or more stringent than the model standards established by the NAIC. See 42 U.S.C.A. § 1395ss(b)(1)(B). In New Jersey, our Legislature delegated to the Commissioner the responsibility for adopting rules *642 establishing standards for Medigap policies. See N.J.S.A. 17B:26A-2. The DOBI promulgated regulations into the New Jersey Administrative Code, which govern all Medigap coverage offered to New Jersey residents. See N.J.A.C. 11:4-23. They obligate the Medigap insurer to pay for the 365 days of hospitalization benefits at the same rate Medicare pays using the DRG payment methodology, as the "appropriate standard of payment." In particular, N.J.A.C. 11:4-23.8(g)(3)iii states that all insurers offering Medigap policies in New Jersey shall pay:
Medicare Part A eligible expenses for hospitalization upon exhaustion of Medicare hospital inpatient coverage, including lifetime reserve days, up to a maximum lifetime benefit of 365 days, to be paid at the Diagnostic Related Group (DRG) outlier per diem, or other appropriate standard of payment as set forth by the Health Care Financing Administration of the United States Department of Health and Human Services for Medicare payments when DRG day outlier payment is not appropriate ....
Moreover, the DOBI also adopted a regulation requiring all Medigap insurers to provide to the patient/insured a simple and understandable explanation of coverage, which advises the elderly that they are not personally liable for hospitalization costs during the 365 days of additional Medigap plan coverage. In pertinent part, it states:
 SERVICES MEDICARE PAYS PLAN PAYS YOU PAY
 HOSPITALIZATION:
 Semiprivate room and
 board, general nursing
 and miscellaneous
 services and supplies
 * * *
 Additional 365 days $0 100% of Medicare $0
 Eligible Expenses
[N.J.A.C. 11:4-23, Appendix[9] (emphasis added).]
According to these regulations, the payment made by the insurer to Valley Hospital utilizing the DRG reimbursement formula was full payment of the carrier's obligation to the hospital. The court is satisfied that knowledge of N.J.A.C. 11:4-23.8(g)(3)iii and N.J.A.C. 11:4-23, Appendix should be imputed to Valley Hospital. Even so, Valley Hospital contends that it may balance bill Mrs. Kroll for the post-Medicare Part A services her late husband received.

3.
The question of whether New Jersey hospitals may charge patients who have exhausted their Medicare Part A benefits a higher amount than patients covered by these benefits is one of first impression in our state. In fact, several federal courts have refused to address this problem because the disputes were between health care providers and Medicare supplement insurers. These courts were not confronted with the specific issue of whether a hospital may balance bill a patient for services he or she received post-Medicare.
In support of its claim, Valley Hospital relies on the opinion of the District of Columbia Circuit Court of Appeals in Vencor, Inc. v. Physicians Mut. Ins. Co., 211 F.3d 1323 (D.C.Cir.2000), which stands alone among the applicable precedent in allowing balance billing. In that case, the *643 provider of long-term hospital care, as third party beneficiary of Medigap insurance policies, sued the insurer, seeking reimbursement for expenses incurred by patients upon the exhaustion of Medicare Part A benefits. The District Court granted summary judgment in favor of Physicians Mutual. The lower court found that the regulations required Medigap insurers to pay 100% of the Medicare-eligible expenses beyond the period covered by Medicare and to provide coverage for hospitalization according to the DRG or other appropriate standard of payment, and the "other appropriate standard of payment" was the amount that Medicare would have paid. The provider appealed. The Court of Appeals reversed the lower court, holding that no federal statute or regulation prohibited the provider from charging its standard rates to patients who have exhausted their Medicare hospital benefits. Id. at 1330.
Relying on 42 U.S.C.A. § 1395cc(a)(1)(A), Physicians Mutual argued that the Medicare Act itself prohibited the health care provider from charging its patients more than the Medicare-approved rate. It claimed that this statute only permits reimbursement to providers which execute a contract with the Secretary of Health and Human Services agreeing "among other things, not to charge ... any individual or any other person for items or services for which such individual is entitled to have payment under this subchapter." Id. at 1325. The appeals court concluded, however, that this federal statute has "nothing to do with charges for post-Medicare services." Ibid. The court noted that there is no language contained in the "subchapter" (Subchapter XVIII, 42 U.S.C. § 1395-1399ccc), which speaks to payment for services rendered "after the lapse of Medicare entitlement. For such entitlements, presumably, they must rely on contract, or perhaps in some cases quasi-contract, under state law." Id. at 1325.
Also considered by the court was Physician Mutual's claim that since Medicare's general purpose is to provide "basic protection against the costs of hospital ... services," 42 U.S.C.A. § 1395c, evinces the intent of Congress to permit Medicare recipients by purchasing Medigap insurance "to extend the benefits and protections under the Medicare Act through the purchase of Medigap insurance." Id. at 1325. The court dismissed such statutory interpretation by relying on Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp., 474 U.S. 361, 373-74, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986), wherein the United States Supreme Court instructed that:
[a]pplication of "broad purposes" of legislation at the expense of specific provision ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.
The court then added that such "a radical scheme as imposition of price controls on medical services not covered by Medicare requires explicit language, not mere brooding purposes." Id. at 1326.
The court also noted that Physicians Mutual failed to identify anything in the authorizing statute governing provider-patient charges and concluded that no such grant of power to NAIC existed. As the *644 Court of Appeals stated: "If the Model Regulation purported to cover such charges, it would be ultra vires." Id. at 1327. Thus, it concluded that NAIC lacked the power and authority to regulate provider-patient charges.
Also rejected by the court was Physician Mutual's argument that the Outline of Coverage contained in Section 16 of the Medigap Model Regulation supported its claim. The court explained that Section 16 sets forth mandatory disclosure provisions which alert the insured that the policy may not fully cover all medical costs. Although Physicians Mutual cited the "YOU PAY" language, which suggests that for the additional 365 days of post-exhaustion hospitalization the "beneficiary pays "$0"", the court held that this table had no legal effect on providers' charges. Id. at 1328.
The court found that the purpose of the disclosures under the Outline of Coverage was "simply to enable the insured to compare premiums and benefits (which are plainly independent of providers' rates), and warns patients (1) that the policy rather than the outline determines coverage, and (2) that the policy may not cover all of the patient's medical costs." Id. at 1329.
Despite the rationale of Physicians Mutual, the court is satisfied that its value as precedent is limited here. In Physicians Mutual, the court was primarily concerned with whether a federal statute or regulation barred balance billing. By comparison to the instant case, the court in Physicians Mutual did not have to decide whether or not a state, like New Jersey, may lawfully enact a regulatory scheme which, in part, limits the "appropriate standard of payment" by a Medigap patient to the DRG payment. See N.J.A.C. 11:4-23.8(g)(3)(iii).
Apart from Physicians Mutual's holding that no federal statute or regulation bars balance billing, the contention of Mrs. Kroll and the Commissioner that New Jersey's regulatory scheme bars balance billing finds ample support in more recent federal court decisions. In fact, the reasoning of the Court of Appeals in Physicians Mutual and its characterization of the issue as one of whether the regulations impose "price controls" has since been questioned by the Ninth Circuit Court of Appeals in Vencor, Inc. v. National States Ins. Co., 303 F.3d 1024 (9th Cir.2002) (held that the insurer was not responsible for any hospital charges beyond those permitted under Medicare).
In National States, the court recognized that the question should be whether the promise hospitals make in order to be reimbursed by Medicare carries over to reimbursement for the same items for services under Medicare supplement insurance policies, whose terms are dictated by the NAIC Model Regulation. The court felt that quite possibly the Medigap regulations were drafted against background understandings that there is such a continuing agreement on the part of the insurer to provide coverage to patients with the same protection they enjoyed under Medicare. The court correctly observed that the consumer protection goal of federal and state law would otherwise make no sense:
Otherwise, the representations made in the Outline would make little sense. So, another way of looking at the same question would be to ask whether the state and federal Medigap statutes and regulations, including  because it is explicitly incorporated into those statutes and regulations  the 1991 NAIC Model Regulation, give rise to an implicit agreement by medical providers, when they accept payment through Medigap insurance, to charge the Medicare rates with regard to items and services covered by that insurance. *645 [Vencor Inc. v. National States Insurance Company, supra, 303 F.3d at 1036]. (emphasis added).
Consequently, the court reached the inescapable conclusion that "... a critical aspect of the contractual and regulatory scheme was left unstated precisely because it was so much a bedrock premise of the involved parties that the need for articulation escaped drafters." Ibid.
In Vencor, Inc. v. Standard Life and Accident Insurance Company, 65 F.Supp.2d 573 (W.D.Ky.1999), aff'd, 317 F.3d 629 (6th Cir.2003), Vencor, Inc. brought suit against Standard Life and Accident Insurance Companya Medicare supplement insurerto recover amounts owed for services provided to insured patients. The provider requested a judgment that it may charge patients who were no longer receiving Medicare Part A benefits its standard and customary charges.
In granting summary judgment for the insurer, the district court for the Western District of Kentucky highlighted the logic of disallowing the balance billing of Medigap patients. The court succinctly observed:
Several other courts around the country have addressed this question. Most of the decisions rely on supplemental insurance regulations to find that providers cannot charge more than the Medicare rate. This Court questions the premise that supplemental insurance regulations create a legally binding limit on the amount that health care providers may charge. After all, the regulations are designed to guide insurers, not providers. While Congress and state legislatures have provided detailed regulation of most aspects of Medicare, they do not yet seem to have clearly denied health care providers the right to charge whatever rates the providers choose after Medicare is exhausted. Whether such an omission, if that is the case, was intentional and meaningful or merely inadvertent is unclear.
Allowing health care providers to charge any amount would create an apparent inconsistency. Such a ruling would expose many elderly or their estates to liability for the amount that the provider's rate exceeded the Medicare rate. Such a result runs counter to the whole purpose of supplemental Medicare insurance regulations. The goal of Medigap policies is to prevent the elderly from facing uncertain and possibly cost prohibitive medical expenses. If providers can charge any amount after the elderly exhaust Medicare benefits and supplemental insurers are not liable, this goal is thwarted and the implicit promise of Medigap policy is made illusory.
Legislation requiring Medigap insurers to write policies covering any amount charged by providers for eligible care could solve this problem. However, neither Congress nor the Tennessee state legislature has chosen to mandate this. One reason may be that to do so would cause the cost of supplemental insurance policies to increase dramatically, likely pricing many elderly out of the supplemental insurance market altogether. This result also appears at odds with the purpose and goals of the current Medicare structure, to ensure that the elderly have access to necessary health care.

[Id. at 579-580 (emphasis added).]
The hospital appealed. The Sixth Circuit Court of Appeals affirmed holding in part that after patients' Medicare Part A benefits were exhausted, the insurer was obligated to pay only the per diem rates allowed by Medicare, not the hospital's standard rates.
The Eleventh Circuit Court of Appeals in Vencor Hospitals v. Blue Cross Blue *646 Shield of Rhode Island, 284 F.3d 1174, 1183 (11th Cir.2002), also concluded that balance billing would be inequitable and violate the Medigap regulatory scheme. Id. at 1183. Interestingly, even Vencor Hospitals, in asserting a cause of action against the Medicare supplement insurer, argued that it would be inequitable and contrary to the intent of the federal and state regulatory schemes to allow the hospital to charge its full rate and pass the difference along to the patients/insureds. Ibid.
In attempting to distinguish the cases relied upon by Mrs. Kroll and the Commissioner, Valley Hospital contends that the Vencor Hospitals provide long-term care and, therefore, are not compensated under the same payment methodology as Valley Hospital. This distinction, however, does not alter the underlying analysis that balance billing should not be permitted under the Medicare supplement insurance law. In the Standard Life case, the court discussed the similarity between the long-term-care hospital's Reasonable Cost Reimbursement System ("RCRS") and the Prospective Payment System ("PPS") in establishing reasonable rates at which a hospital is reimbursed by Medicare.[10] The court noted:
In the context of healthcare policy, recognizing costs as reasonable and limiting costs are two sides of the same coin. HCFA limits costs to the amount it recognizes as reasonable. When HCFA chooses to implement the RCRS through per diem rates, they are indicating that the per diem rate is what they "recognize as reasonable".
[Vencor, Inc. v. Standard Life and Accident Insurance Company, supra, 65 F.Supp.2d at 578].
Furthermore, comments published in the Federal Register related to the long-term-care hospitals PPS final rule similarly state that the federal government's consistent interpretation has required the Medicare supplement insurer to make payments at the rate Medicare would have paid had Medicare Part A hospital days not been exhausted. See 67 F.R. 55974-55975.

4.
Although any effort to explain why the original drafters of the federal Medicare supplement insurance law did not answer the balance billing issue would be speculative, both the federal government and the NAIC have since acknowledged that balance billing is irreconcilable with the regulatory scheme. In December 1998, the NAIC adopted an amendment to the Model Regulation. Indeed Section 8B(3) of the Model Regulation now requires that all Medigap plans provide:
Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A eligible expenses for hospitalization paid at the diagnostic related group (DRG) day outlier per diem or other appropriate standard of payment, subject to a lifetime maximum benefit of an additional 365 days. The *647 provider shall accept the issuer's payment as payment in full and may not bill the insured for any balance.

[See Model Regulation § 8B(3) at 651-12 (emphasis added).]
Below this provision is an NAIC drafting note which expressly states that "[t]he Outline of Coverage specifies that the beneficiary will pay `$0,' and the provider cannot balance bill the insured"[11] (emphasis added). See Model Regulation § 8B(3), Drafting Note, at 651-12.
Moreover, the legislative history specifically provides that:
The [NAIC] regulators discussed amending the model regulation in mid-1998 to clarify that balance billing is not allowed .... The purpose of the amendment was to address the situation where some providers of hospital services to Medicare beneficiaries bill above the Medicare-approved amount after the exhaustion of hospital reserve days. If the beneficiary has Medicare supplemental insurance, the provider attempts to collect the full billed charge from the insurer. The amendments clarified that the provider must accept the issuer's payment as payment in full and may not bill the insured for any balance.

See Model Regulation, Legislative History, at 651-105 (emphasis added).
The 1998 amendment, drafting note and legislative history imply that the 1991 NAIC Model Regulation always intended to forbid billing a Medigap patient/insured over and above the Medicare-approved rate. Even so, Valley Hospital contends that the arguments against balance billing made by Mrs. Kroll and the Commissioner neglect the fact that 42 U.S.C.A. § 1395ss(a)(2)(A) specifically refers to the earlier 1991 regulation. In view of this explicit statutory authorization, the hospital argues that the 1998 amendment demonstrates the NAIC's belief that additional language was indispensable to clarify the balance billing question. In fact, Valley Hospital observes that the legislative history submitted by Mrs. Kroll references the comment by one representative from the HCFA that the agency did not support the NAIC's viewpoint due to the fact that "the Social Security Act was silent on providers billing beyond the reserve 150 days." See Model Regulation, Legislative History at 651-105.
Unlike several states, New Jersey has not yet adopted the 1998 amendment, which expressly prohibits balance billing.[12] Nevertheless, it does not follow that balance billing is allowed. Although the 1998 amendment has not yet been adopted in New Jersey, the Commissioner has interpreted New Jersey's current Medicare supplement law to bar balance billing. The court agrees with the Commissioner's interpretation because it is the only rational one bearing in mind the consumer protection point of the regulatory scheme. See Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742, 749 (1984) ("the agency's interpretation is *648 entitled to prevail, so long as it is not plainly unreasonable."). See also Turnpike Authority v. AFSCME Council 73, 150 N.J. 331, 351, 696 A.2d 585, 595 (1997).[13]
Valley Hospital also argues that the significance of the Model Regulation is diminished because the DOBI did not address this issue in a recent proposal to amend N.J.A.C. 11:4-23.8, which was published in the New Jersey Register on January 6, 2003. See 35 N.J.R. 71(a). However, this argument lacks merit because the purpose of this amendment was to conform the rules to recent changes in federal law affected by the Balanced Budget Reconciliation Act of 1999 and the Medicare, Medicaid, and State Health Insurance Program Benefits Improvement and Protection Act of 2000. Indeed the DOBI concedes it was unaware of the existence of the balance billing issue until it was brought to its attention in this action.

5.
Valley Hospital contends that its right to balance bill Mrs. Kroll is expressly authorized by federal regulations. In support of its claim, the hospital refers to subsection (e) of 42 C.F.R. § 412.42, which provides:
Services furnished on days when the individual is not entitled to Medicare Part A benefits or has exhausted the available benefits. The hospital may charge the beneficiary its customary charges for noncovered items and services furnished on outlier days (as described in Subpart F of this part) for which payment is denied because the beneficiary is not entitled to Medicare Part A or his or her Medicare Part A benefits are exhausted. (1) If payment is considered for outlier days, the entire stay is reviewed and days up to the number of days in excess of the outlier threshold may be denied on the basis of nonentitlement to Part A or exhaustion of benefits. (2) In applying this rule, the latest days will be denied first.
The hospital argues that this regulation permits it to charge Medicare beneficiaries, who have exhausted their Part A coverage, its customary charges for services furnished on outlier days, without any exception for Medicare Part A beneficiaries who have purchased Medigap insurance.
It also relies on 42 C.F.R. § 489.21, which sets forth elements required to be included in all Medicare provider agreements. It provides, in pertinent part:
Except as specified in subchapter C of this part, the provider agrees not to charge a beneficiary for any of the following:
(c) Inpatient hospital services furnished to a beneficiary who exhausted his or her part A benefits, if CMS reimburses the provider for those services.
This regulation directly relates to situations where Part A benefits have been exhausted by the beneficiary and only bars providers from charging beneficiaries for its service if the CMS has reimbursed the provider for those services.
Valley Hospital also contends that because of these regulations, the CMS has included in its Hospital Manual Chapter IVBilling Procedures § 415.3[E] entitled "Charges to Beneficiaries by PPS Hospitals." Although a PPS hospital, like Valley *649 Hospital, is expressly permitted by § 415.3[E] to bill a beneficiary its customary charges "after the Part A benefits are exhausted", the Manual does not provide that a hospital may bill a patient its full charges when a person is covered by Medicare supplement insurance.
In relying on these federal regulations, Valley Hospital makes a statutory construction argument using the canon of expressio unius est exclusio alterius, which stands for the proposition that explicit mention of one thing in a statute[14] implies congressional intent to exclude similar things not specifically mentioned. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). It contends that neither regulation carves out an exception related to individuals who have purchased Medigap policies and, if such a prohibition exists, it would be included in these regulations, which expressly relate to the relationship between Medicare PPS hospitals and patients who have exhausted their Medicare Part A benefits.
This statutory construction argument, however, is not premised upon a rule of law. It merely is an aid to ascertain legislative intent and employed with great caution. Allstate Insurance Company v. Malec, 104 N.J. 1, 8, 514 A.2d 832, 835-36 (1986); Masel v. Paramus Borough Council, 180 N.J.Super. 32, 41, 433 A.2d 794, 798-99 (App.Div.1981). It usually serves to describe a result, rather than to assist in reaching it. Reilly v. Ozzard, 33 N.J. 529, 166 A.2d 360 (1960); New Jersey Civil Service Ass'n, Camden Council No. 10 v. Mayor and City Council of Camden, 135 N.J.Super. 308, 343 A.2d 154, (Law Div.1975). In addition, it applies equally to the counter argument that 42 C.F.R. § 412.42 does not state that a hospital may balance bill its customary charges to a patient covered by Medigap insurance.
In order to discern the legislative intent, the statute's goal must be examined. Carpenter v. Technology Corporation v. Admiral Insurance Company, 172 N.J. 504, 514, 800 A.2d 54, 60 (2002). When different interpretations of a statute are arguable, the court is obligated to look beyond its language, to discover the "spirit of the law". Ibid., citing Storch v. Sauerhoff, 334 N.J.Super. 226, 229, 757 A.2d 836, 838 (Ch.Div.2000). In addition, where a literal reading will lead to a result not in accord with the essential purpose and design of the statute, the spirit of the law will control its letter. 172 N.J. at 513, 800 A.2d at 59, citing Roig v. Kelsey, 135 N.J. 500, 641 A.2d 248 (1994). See also N.J.S.A. 1:1-1 (stating that courts construe words and phrases according to their generally accepted meaning unless that meaning is inconsistent with legislative intent). 172 N.J. at 513, 800 A.2d at 59 citing N.J.S.A. 1:1-1. Thus, a court's ultimate goal in construing a statute is to ensure that the Legislature's plan is effectuated. Ibid., citing Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 741 A.2d 591 (1999). It is not words, but the internal sense of the law that controls. See Jimenez v. Baglieri, 152 N.J. 337, 347, 704 A.2d 1285, 1290 (1998). Moreover, legislative intent may also be inferred on grounds of policy or reasonableness. Ibid., citing McCann v. Clerk of Jersey City, 338 N.J.Super. 509, 770 A.2d 723, (App.Div.), aff'd, 167 N.J. 311, 771 A.2d 1123 (2001). In fact, a court will seek to avoid a construction resulting in unreasonableness. See Application of Summit & Elizabeth Trust Co., 111 *650 N.J.Super. 154, 268 A.2d 21 (App.Div. 1970).
Exposing many elderly or their estates to liability for the amount that a hospital's rate exceeds the Medicare-approved rate is at odds with the goal of Medigap insurance. The Commissioner has interpreted New Jersey's supplement insurance regulatory scheme in a manner that is consistent with this goal. This interpretation is a reasonable one and entitled to due deference.
Since N.J.A.C. 11:4-23 sets forth New Jersey's regulatory scheme, the court rejects Valley Hospital's claim that a decision by the court is rule-making outside the parameters of the Administrative Procedure Act contained in N.J.S.A. 52:14B-1 On the contrary, the court's decision merely confirms the Commissioner's interpretation as correct.

6.
Valley Hospital argues that any interpretation of N.J.A.C. 11:4-23 prohibiting balance billing would directly conflict and interfere with the federal right to bill Medicare patients when their Part A benefits have been exhausted and, therefore, would be preempted by federal law, citing Jones v. Rath Packing Co., 430 U.S. 519, 525-526, 97 S.Ct. 1305 1309-1310, 51 L.Ed.2d 604613-615 (1977) and also New York City Health and Hospitals v. Perales, 954 F.2d 854, 859-861 (2nd Cir.1992) (holding that New York state regulation limiting state's responsibility for Medicare Part B cost-sharing coverage for dual eligible patient violated the Medicare and Medicaid Acts). These cases, however, are irrelevant because they do not address the question of whether a hospital may balance bill a patient covered by Medigap insurance for post-Medicare Part A services.
Moreover, the judicial doctrine of preemption is inapplicable. This doctrine "rests upon the supremacy clause of the federal constitution, and deprives a state of jurisdiction over matters embraced by a congressional act regardless of whether the state law coincides with, is complementary to, or opposed to the federal congressional expression." Painters Local Union No. 567 of the Brotherhood of Painters, Decorators and Paperhangers of America v. Tom Joyce Floors, Inc., 81 Nev. 1, 398 P.2d 245, 246 (1965). When Congress legislates in an area of federal concern, it may specifically preempt all state legislation (thus occupying the field), or may bar only inconsistent legislation; where Congress does not directly indicate its intention in this regard, the court will determine that intention based on the nature and legislative history of the enactment. See Hines v. Davidowitz, 312 U.S. 52, 66, 61 S.Ct. 399, 404, 85 L.Ed. 581, 586-587 (1941).
Valley Hospital has been unable to show by clear and manifest evidence either that Congress intended to occupy the field of Medicare balance billing practices to the exhaustion of the states or that state regulation of Medicare balance billing practices would interfere with the goals of the Medicare Program.[15] In fact, both the Medicare *651 Act and associated regulations are silent as to whether a hospital may balance bill for post-Medicare Part A services. Consequently, New Jersey's regulatory scheme is entitled to a presumption of validity because it regulates an area within the traditional realm of state policy and no express preemption provision exists in the Medicare statute.

7.
By its terms, Mr. Kroll's Medigap policy obligated the carrier to pay the Medicare-approved rate for the post-Medicare Part A services rendered to him by Valley Hospital. As assignee of the policy, the hospital obtained all of the assignor's rights to collect the benefits under the policy. Tirgan v. Mega Life & Health Ins., 304 N.J.Super. 385, 700 A.2d 1239 (Law Div. 1997). Acceptance of the assignment was a benefit to Valley Hospital because it was guaranteed prompt payment by the carrier.
Although Valley Hospital received payment from the insurer under the DRG methodologythe same one used during the Medicare periodit contends that Mrs. Kroll's failure to pay the balance bill of its standard charges constitutes a breach of contract. Regarding this claim, Mrs. Kroll executed a form entitled "AN AGREEMENT TO PAY FOR SERVICES AND ASSIGNMENT OF REIMBURSEMENT BENEFITS" prior to Mr. Kroll's third and final hospitalizations. It provides, in pertinent part, that "[i]n consideration of the services rendered to me at or by the Valley Hospital, I hereby agree to pay the Hospital ... the full and entire amount due for all services received by me."
To the extent that this ostensible agreement may be construed to permit balance billing, it is unenforceable as a contract of adhesion. See Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 356, 605 A.2d 681, 687 (1992) (the applicable standards include the subject matter of the contract, the standardized form of the document, the relative bargaining positions of the parties, the degree of economic compulsion motivating the "adhering" party, the take-it-or-leave-it nature, and the public interests affected). The document signed by Mrs. Kroll was a standardized form prepared by Valley Hospital. It fails to describe the hospital's rates of compensation and, more particularly, is conspicuously silent on the question of balance billing. The terms contained in the form were non-negotiable. The hospital clearly exercised a decisive advantage in bargaining. Prior to any treatment, a patientor in this case someone acting on his behalfwas compelled to sign it. The patient was in no position to reject the proffered agreement, to bargain with the hospital or, in lieu of agreement, to find another hospital. The treatment rendered to Mr. Kroll was medically necessary and the option of walking away from the deal was simply unrealistic.
Consequently, Valley Hospital's balance billing claim must inevitably depend on quasi-contracts, which, "unlike true contracts, are not based on the apparent intention of the parties to undertake the performance in question, nor are they promises. They are obligations created by *652 law for reasons of justice." See Restatement (Second), Contracts § 4b (1981). With respect to post-Medicare Part A services, Valley Hospital's measure of damages is limited to quantum meruit, which equates to the reasonable value of services rendered by the hospital to decedent. The total paid to Valley Hospital by decedent's Medigap insurer is reasonable given that it corresponds to New Jersey's regulatory scheme, which utilizes the DRG payment methodologya reimbursement formula representing the average cost for each illness. As a result, Mrs. Kroll's financial obligation to Valley Hospital is fully satisfied. In fact, any claim for payment of charges beyond the DRG rate would be unenforceable given that the DOBI regulations and our state's public policy bar balance billing. See Sheridan v. Sheridan, 247 N.J.Super. 552, 589 A.2d 1067 (Ch.Div. 1990) (held that no court will enforce or entertain construction of contract in manner incompatible with laws or public policies of state).
For all of the foregoing reasons, Mrs. Kroll's motion for partial summary judgment is granted.
NOTES
[1] On February 20, 2003, the court entered an order granting leave to the Commissioner to appear in this matter as amicus curiae; to file a letter brief addressing the issue of whether N.J.A.C. 11:4-23 precludes balance billing by a hospital; and to further participate at any oral arguments, and through additional briefing as may be court ordered. See R. 1:13-9.
[2] Mrs. Kroll claims that Valley Hospital misled Mr. Kroll's family into believing that he was fully covered under the Medigap policy. Because of the court's ruling, Mrs. Kroll's claim that Valley Hospital is equitably estopped from asserting its right to recover the claimed indebtedness is moot. Moreover, both Mrs. Kroll's motion to dismiss the complaint for failure to provide discovery and Valley Hospital's cross-motion for a protective order are also moot.
[3] Mrs. Kroll asserts counterclaims and third-party claims for medical malpractice and other wrongs committed during her husband's care. These claims are unrelated to the motion before the court.
[4] AARP was not named a party in this litigation. Mr. Kroll's Medigap policy was underwritten by United HealthCare Insurance Company of Fort Washington, Pennsylvania.
[5] The court calculates the difference between Valley Hospital's charges and the amount paid by AARP as $272,476.61. The amount of the claimed indebtedness, however, is $257,188.90. This discrepancy has not been explained to the court. Nevertheless, these different figures are not material to the court's decision.
[6] The other part of the Medicare program is Part B. Part B covers other medical expenses, including physicians' fees, therapies, and supplies. See 42 U.S.C.A. § 1395j.
[7] The Secretary of Health and Human Services established a fixed reimbursement rate for each DRG based upon the average length of stay by patients within that DRG, adjusted for the type of hospital providing the services and the geographic area in which the hospital is located. See, 42 U.S.C.A. § 1395www; 42 C.F.R. part 412; 1 Medicare & Medicaid Guide, ¶ 4200.
[8] Mrs. Kroll contends that the provider agreement entered into between Valley Hospital and the HCFA is relevant to the issue in dispute. This agreement has not been produced to the court and Mrs. Kroll suspects it may contain provisions requiring Valley Hospital to accept reimbursement of the Medicare approved amount as full payment for its services. The court, however, is satisfied that such an agreement is irrelevant because all of the monies sought by Valley Hospital relate to services rendered after Mr. Kroll exhausted his Medicare Part A benefits. In addition, the court does not have to review this agreement because 42 U.S.C.A. § 1395cc delineates the specific terms that all Medicare providers must agree to in order to participate in the program.
[9] This Appendix applies to Plan F purchased by Mr. Kroll.
[10] Prior to 1983, hospitals that participated in the Medicare program were reimbursed retrospectively for their actual "reasonable" costs. Because this system failed to encourage healthcare providers to utilize resources efficiently and to maintain or cut costs, Congress changed the reimbursement method in 1983 to the PPS system. See 42 U.S.C.A. § 1395ww, as amended by Pub.L. 98-21, 97 U.S. Stat. 65, 149-162; Episcopal Hosp. v. Shalala, 994 F.2d 879, 881 (D.C.Cir.), cert. denied, 510 U.S. 1071, 114 S.Ct. 876, 127 L.Ed.2d 73 (1994). S.Rep. No. 23, 98th Cong., 1st Sess. 47, reprinted in 1983 U.S.Code Cong. & Admin.News 143, 187; 1 Medicare & Medicaid Guide [CCH] ¶ 4200. Under PPS, every medical diagnosis is categorized in a DRG.
[11] The court is aware that the Outline of Coverage is not part of the Medigap policy. N.J.S.A. 17B:26A-7a prescribes that all health insurance policies shall be accompanied by an Outline. The statute provides that the Outline shall contain "[a] statement that the outline of coverage is a summary of the policy... and that the policy should be consulted to determine governing contractual provisions." N.J.S.A. 17B:26A-7b(4).
[12] The states include California, West's Ann. Cal. Health and Safety Code § 1358.8; Delaware, Code Del. Regs. 50 000 041; Maine, 02-031 CMR Chapter 275, § 8; North Dakota, NDAC 45-06-01.1-06; Oregon, OAR XXX-XXX-XXXX (regulation states that balance billing is injurious to the public and a violation of the Oregon Unfair Trade Practices Act; and Vermont, Vt. Code R. 21 040 013).
[13] The court rejects Valley Hospital's contention that if the DOBI intended to bar hospitals from seeking such payments from patients, it presumably would do so expressly in a regulation as it did, for example, in N.J.A.C. 11:3-29.5, where it barred medical providers from balance billing insureds for any charges in excess of the medical fee schedule established for PIP payments.
[14] A rule of an administrative agency is subject to the same canons of construction as a statute. Matter of N.J.A.C. 14A:20-1.1, 216 N.J.Super. 297, 306, 523 A.2d 686, 691 (App. Div.1987); Essex County Welfare Bd. v. Klein, 149 N.J.Super. 241, 247, 373 A.2d 691, 694 (App.Div.1977).
[15] Whether state restrictions on Medicare balance billing are preempted by the Medicare Act in the context of Part B of the Medicare program was discussed in several cases. See Pennsylvania Medical Society v. Marconis, 942 F.2d 842, 857 (3d Cir.1991) (held that the Pennsylvania Health Care Practitioners Medicare Fee Control Act (FCA), which prohibits physicians who treat Medicare patients from billing those patients in excess of the recognized payment amount established by the Medicare program, was upheld against a challenge based on the Supremacy Clause of the United States Constitution); Massachusetts Medical Soc' y v. Dukakis, 815 F.2d 790, 796-97 (1st Cir.1987) (held that a Massachusetts statute prohibiting balance billing of patients with Medicare insurance was not preempted by federal legislation and did not violate the Due Process Clause of the Fourteenth Amendment); and Medical Soc'y of N.Y. v. Cuomo, 111 F.Supp. 1157-1164 (S.D.N.Y.1991) (held that a New York statute limiting the amount physicians could balance bill to less than the amount permitted under the federal Medicare Act was not preempted by the Medicare Act and did not violate the Due Process Clause of the Fourteenth Amendment).